[No. 49362–6.   En Banc.   October 20, 1983.]

JOHN A. GOODMAN, *Petitioner*, v. DARDEN, DOMAN & STAFFORD ASSOCIATES, ET AL, *Respondents.*

*James L. Varnell* and *Ziontz, Pirtle, Morisset, Ernstoff & Chestnut,* for petitioner.

*James F. Hoover* and *Inslee, Best, Chapin & Doezie, P.S.,* for respondents.

DIMMICK, J.—John Goodman signed a contract as president of a corporation "in formation." The narrow issue in the instant appeal is whether Goodman, as an individual, is a party to arbitration proceedings brought under the contract. The trial court held he was not. The Court of Appeals reversed, holding the evidence was insufficient to support the trial court's conclusion. We affirm the Court of Appeals.

Goodman, a real estate salesman, sold an apartment building to Darden, Doman & Stafford Associates (hereafter DDS), a general partnership. The apartments needed extensive renovation and Goodman represented that he personally had experience in renovation work. During the course of negotiations on a renovation contract, Goodman informed Don Doman, managing partner of DDS, that he would be forming a corporation in order to limit his personal liability.

A contract was executed in August 1979 between DDS and "BUILDING DESIGN AND DEVELOPMENT INC. (In Formation) John A. Goodman, President." The partners of DDS knew that the corporation was not yet in existence and they testified at trial that they never agreed to look solely to the corporation for performance of the contract. The contract

required that work be completed by October 15 and contained an arbitration clause. Goodman immediately subcontracted the work. The work was not completed by October 15 and the work which was done was allegedly of poor quality. On November 1, after this apparent default, Goodman filed articles of incorporation. A corporate license was issued the next day.[1] The first meeting of the board of directors was not held until February 1980.

Between August and December 1979 DDS made five progress payments on the contract. The first check was made out to "Building Design and Developement [sic] Inc.—John Goodman." Goodman struck out his name and endorsed the check "Bldg. Design & Dev. Inc., John A. Goodman, Pres." He instructed DDS to make further payments to the corporation only.

In May 1980, after attempts to remedy the alleged breaches, DDS served Goodman with a demand for arbitration. The demand named both the corporation and Goodman. The record is not clear as to the present status of the corporation although it shows some effort on Goodman's part to sell the corporation. Goodman moved for a stay of arbitration and an order dismissing him from the arbitration proceedings. The trial court entered an order dismissing Goodman, as an individual, from the arbitration. The Court of Appeals reversed. *Goodman v. Darden, Doman & Stafford Assocs.,* 33 Wn. App. 278, 653 P.2d 1371 (1982).

The issue in this appeal is whether Goodman, as a promoter,[2] is a party to the preincorporation contract and as such whether he is required to take part in the arbitration. As a general rule

> where a corporation is contemplated but has not yet been organized at the time when a promoter makes a

---

[1] The corporation's name when formed was "Building Renovation and Design Consultants, Inc."

[2] A promoter is one who alone or with others forms a corporation and procures for it the rights, instrumentalities and capital to enable it to conduct its business. 1 W. Fletcher, *Private Corporations* § 189 (1974).

contract for the benefit of the contemplated corporation, the promoter is personally liable on it, even though the contract will also benefit the future corporation.

*Harding v. Will,* 81 Wn.2d 132, 139, 500 P.2d 91 (1972); *Heintze Corp. v. Northwest Tech–Manuals, Inc.,* 7 Wn. App. 759, 760, 502 P.2d 486 (1972);[3] *Refrigeration Eng'g Co. v. McKay,* 4 Wn. App. 963, 972, 486 P.2d 304 (1971); 18 Am. Jur. 2d *Corporations* § 127 (1965); Annot., *Personal Liability of Promoter to Third Person on or With Respect to Contract Made for Corporation or in Aid of Promotion,* 41 A.L.R.2d 477 (1955). There is a "strong inference that a person intends to make a present contract with an existing person." *White & Bollard, Inc. v. Goodenow,* 58 Wn.2d 180, 184, 361 P.2d 571 (1961).

An exception to the general rule is that if the contracting party knew that the corporation was not in existence at the time of contracting but nevertheless agreed to look solely to the corporation for performance, the promoter is not a party to the contract. *Heintze Corp. See also Frazier v. Ash,* 234 F.2d 320 (5th Cir. 1956); *Sherwood & Roberts–Oregon, Inc. v. Alexander,* 269 Or. 389, 525 P.2d 135 (1974); 18 Am. Jur. 2d *Corporations* § 127 (1965); Annot., 41 A.L.R.2d 477.

As the proponent of the alleged agreement to look solely to the corporation, Goodman has the burden of proving the agreement. *Johnson v. Nasi,* 50 Wn.2d 87, 309 P.2d 380 (1957). As with any agreement, release of the promoter

---

[3]The *Heintze* court held that RCW 23A.44.100 codified this rule. That statute states: "All persons who assume to act as a corporation without authority so to do shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof." The Supreme Court of Oregon has criticized this reasoning, stating that RCW 23A.44.100 was only intended to abolish the doctrine of de facto corporations and not to alter the liability of promoters. *Sherwood & Roberts–Oregon, Inc. v. Alexander,* 269 Or. 389, 525 P.2d 135 (1974). *Roberts* nonetheless held that the common law rule is the same as that applied in *Heintze.* Because the common law in this state is well settled as to promoter liability and the parties rely on that common law, we expressly decline at this time to decide whether the purpose of RCW 23A.44.100 is to codify these common law principles on promoter liability or to abolish de facto corporations.

depends on the intent of the parties. The parties did not manifest their intentions in the contract. Goodman argues that the language indicating that the corporation was "in formation" was an expression by the parties of their intent to make the corporation alone a party to the contract. Some courts do look to such language in the contract and contemporaneous documents to determine intent to release the promoter. *See Stap v. Chicago Aces Tennis Team, Inc.,* 63 Ill. App. 3d 23, 379 N.E.2d 1298 (1978); *H.F. Philipsborn & Co. v. Suson,* 59 Ill. 2d 465, 322 N.E.2d 45 (1974); *Schwedtman v. Burns,* 11 S.W.2d 348 (Tex. Civ. App. 1928). Those cases and others cited by Goodman do not analyze the agreements in light of a "strong inference" that one intends to contract with an existing party—an inference we must keep in mind. The mere signing of a contract with a corporation "in formation" does not suffice to show an agreement to look solely to the corporation. It simply begs the question to say that such language in a contract with a promoter in and of itself constitutes an agreement to release the promoter from the contract. Rather, the language raises the question of the parties' intent. Given the "strong inference" that DDS intended to contract with an existing party, the "in formation" language drafted by Goodman is at best ambiguous as to the parties' intentions.

Courts of other jurisdictions differ in their approach as to how specific the agreement must be to release a promoter from a contract and what evidence they will consider in determining the parties' intent. *See generally* Annot., 41 A.L.R.2d 477 (1955). As noted by the Court of Appeals:

> Some jurisdictions require that the contract show clearly on its face that there is *no* intent to hold the promoter liable before he is released. *Vodopich v. Collier Cy. Developers, Inc.,* 319 So. 2d 43, 45 (Fla. Dist. Ct. App. 1975). The agreement must be "specific" or "express." *Malisewski v. Singer,* 123 Ariz. 195, 598 P.2d 1014 (Ct. App. 1979); *Spence v. Huffman,* 15 Ariz. App. 99, 486 P.2d 211 (1971). In *RKO–Stanley Warner Theatres, Inc. v. Graziano,* 467 Pa. 220, 223, 355 A.2d 830, 832 (1976), the contract stated:

> "It is understood by the parties hereto that it is the intention of the Purchaser to incorporate. Upon condition that such incorporation be completed by closing, all agreements, covenants, and warranties contained herein shall be construed to have been made between Seller and the resultant corporation and all documents shall reflect same."

The court held that "while [this paragraph] does make provision for recognition of the resultant corporation as to the closing documents, it makes no mention of any release of personal liability." 467 Pa. at 226. Since the paragraph did not expressly provide for release on closing, the court found it ambiguous and construed it to hold the promoter liable until the corporation actually ratified the contract.

33 Wn. App. at 281–82.

We do not believe the agreement to release a promoter from liability must say in so many words, "I agree to release." Where the promoter cannot show an express agreement, existence of the agreement to release him from liability may be shown by circumstances. Of course, where circumstantial evidence is relied on, the circumstances must be such as to make it reasonably certain that the parties intended to and did enter into the agreement. *Kellogg v. Gleeson,* 27 Wn.2d 501, 178 P.2d 969 (1947).

Goodman cites *Quaker Hill, Inc. v. Parr,* 148 Colo. 45, 364 P.2d 1056 (1961) and *Sherwood & Roberts–Oregon, Inc. v. Alexander, supra,* as cases similar to this one. The courts in those cases found that the promoter had been released from liability. Among the circumstances considered by those courts was the fact that the parties seeking personal liability on the part of the promoter actually urged that the contract be made in the name of the proposed corporation. DDS did not so urge Goodman or even suggest incorporation to him.

■ The trial court did not make a written finding that the parties intended to look solely to the corporation for performance. Thus we may look to the oral decision to clarify the theory on which the trial court decided the case. *Heikkinen v. Hansen,* 57 Wn.2d 840, 360 P.2d 147 (1961).

From its oral opinion it is clear that the trial court relied on three considerations in holding that the parties agreed to release Goodman from the contract: (1) DDS knew of the corporation's nonexistence; (2) Goodman told Doman that he was forming a corporation to limit his personal liability; and (3) the progress payments were made to the corporation.

The fact that DDS knew of the corporation's nonexistence is not dispositive in any way of its intent. The rule is that the contracting party may know of the nonexistence of the corporation *but nevertheless* may agree to look solely to the corporation. The fact that a contracting party knows that the corporation is nonexistent does not indicate any agreement to release the promoter. To the contrary, such knowledge alone would seem to indicate that the members of DDS intended to make Goodman a party to the contract. They could not hold the corporation, a nonexistent entity, responsible and of course they would expect to have recourse against someone (Goodman) if default occurred. This consideration also relates to another factor the trial court apparently had in mind—that the members of DDS were all educated people. Goodman argues that as such they should have expressly requested that he be personally liable. This was unnecessary because under the law as set out above, Goodman was liable until the partners of DDS agreed otherwise. Thus, they were not required to specify personal liability.

The fact that Goodman expressed a desire to form the corporation to limit his liability also is not dispositive of the intentions of the members of DDS. No one from DDS objected to his incorporating but this failure to object does not indicate an affirmative assent to limit Goodman's personal liability. Apparently Goodman believed that incorporation would automatically limit his liability thus misunderstanding the rules regarding promoter liability. The Court of Appeals correctly held in this regard:

> Even if the expression of desire constituted an offer to make release a term of the contract, silence is acceptance

only when there is a duty to speak. *American Aviation, Inc. v. Hinds,* 1 Wn. App. 959, 465 P.2d 676 (1970). DDS had no duty to correct, or even perceive, Goodman's mistaken interpretation of the promoter liability rules.

33 Wn. App. at 282.

The only other evidence of the parties' intent to make the corporation the sole party to the contract is that the progress payments were made payable to the corporation. However, they were so written only at the instruction of Goodman and in fact the first check written by DDS after the signing of the contract was written to the corporation *and* Goodman as an individual. This evidence does not show by reasonable certainty that DDS intended to contract only with the corporation. *See Wolfe v. Warfield,* 266 Md. 621, 296 A.2d 158 (1972).

Goodman argues that we should not examine the evidence in this manner because in doing so we improperly reweigh it. We acknowledge appellate review is limited to determining whether a trial court's findings are supported by substantial evidence and, if so, whether the findings in turn support the conclusions of law. *Holland v. Boeing Co.,* 90 Wn.2d 384, 390, 583 P.2d 621 (1978). From the oral decision it is clear that the court made a finding that DDS intended to look solely to the corporation as a party to the contract based on the items of evidence discussed above. We can uphold this finding of intent only if the evidence supporting it is substantial; we find that it is not.

The trial court erred in dismissing Goodman from the arbitration proceedings. We therefore remand.

WILLIAMS, C.J., ROSELLINI, BRACHTENBACH, and PEARSON, JJ., and HAMILTON, J. Pro Tem., concur.

DORE, J. (dissenting)—The trial court found that Darden, Doman and Stafford Associates (DDS) intended to look solely to the corporation as the party of the contract. There is substantial evidence in the record to substantiate this finding. I would affirm the trial court and dismiss

Goodman from the arbitration proceedings.

As the majority states at pages 478–79, as a general rule

> where a corporation is contemplated but has not yet been organized at the time when a promoter makes a contract for the benefit of the contemplated corporation, the promoter is personally liable on it, even though the contract will also benefit the future corporation.

*Harding v. Will,* 81 Wn.2d 132, 139, 500 P.2d 91 (1972) [quoting *Refrigeration Eng'g Co. v. McKay,* 4 Wn. App. 963, 972, 486 P.2d 304 (1971)].

Promoters are *not* personally liable, however, on contracts made in the name of a corporation not in existence at the time of contracting, where the intention to make the contract in the future corporation's name is known to the other contracting party. *Heintze Corp. v. Northwest Tech-Manuals, Inc.,* 7 Wn. App. 759, 760, 502 P.2d 486 (1972).

The issue on appeal is thus whether there is substantial evidence in the record that DDS accepted the obligation of a yet–to–be–formed corporation and did not hold John Goodman as an individual responsible. I believe there is.

The record indicates that Goodman was a licensed real estate salesman for West & Wheeler Associates, Inc., from 1973 through 1978, and the department manager of its property management division. In May 1979, he sold an apartment house, Suncrest Apartments, to his friend Dick Gimperle, an architect. As sales agent, he received a small amount of cash, the remainder of his commission to be paid by a $4,000 promissory note. Gimperle assigned his interests in the property to DDS. The partnership was a highly educated and qualified group which included an architect, a Ph. D., and a lawyer. The managing partner was an architect who had extensive experience in constructing condominiums, office buildings and single–family homes. The Suncrest Apartments needed considerable renovation and had about 10 to 12 vacancies at the time of the sale. Gimperle introduced Goodman to DDS' managing partner, Doman, as a possible contractor to do the renovation work. Originally, Goodman wanted only to be a consultant and

not the actual contractor, but Gimperle and Doman persuaded him to do the contracting work. Toward the end of the negotiations, Goodman told Doman that he would be forming a corporation to insulate against liability. The record indicates Doman had no objection to Goodman forming a corporation to insulate against liability.

Doman insisted the parties sign an American Institute of Architects' Standard Form of Agreement Between Owner and Contractor. Doman prepared the contract, including the schedule of the repairs, indexed exterior renovation, interior renovation and specifications for the floor plans, etc. Goodman was the first to sign on August 9. On August 18, the other parties signed the contract and it became operative. The first page of the contract contains a typewritten provision stating,

> This is a *two party* agreement. Where ever [*sic*] third party responsibilities are assigned in this agreement to a third party (Architect) as agent of the Owner, those third party responsibilities are to be assumed by the Owner unless the context clearly indicates to the contrary.

(Italics mine.) Exhibit 1.

## I

Immediately after signing the contract, Goodman went to his attorney and directed him to prepare articles of incorporation to insulate against his personal liability. His attorney prepared incorporation documents, which were signed on October 2, 1979. The name they had selected for incorporation was not available, however, and they had to select a new name, "Building Renovation and Design Consultants, Inc." This caused further delay and incorporation was not completed until November 1, 1979. Doman scheduled the project completion date of October 15. The work went slowly, however, and the work was not completed at that time.

Doman made all checks out to the corporate name, Building Design and Development, Inc., at Goodman's request. The original check had been made out to both the

corporation and Goodman individually, but Goodman had his name deleted and a new check issued in the name of the corporation only. Doman had no objection to this and impliedly acknowledged that he would look to the corporation and not to Goodman as an individual. All of such checks were deposited in the corporation's bank account at Rainier National Bank, Westlake branch. Neither Goodman nor the corporation profited from the Suncrest Apartments contract, and there was no commingling of the personal assets and liabilities of Goodman with the corporation.

On November 1, 1979, a certificate of incorporation was issued to Goodman. The court found that at that time the corporate entity was fully capitalized and operating. DDS was aware of the incorporation and continued to make the checks payable to the corporation. Subsequently, Goodman had the corporation ratify the contract as an action of the corporation.

## II

It is clear from the actions of DDS, and its failure to insist upon a personal guaranty from Goodman, that DDS impliedly agreed to look solely to the corporation for performance.

I cannot agree with the majority's conclusion that Goodman's expressed desire to form a corporation to limit his liability does not reflect on the intentions of the members of DDS. If they did not agree with Goodman to look solely to the corporation as the legally responsible entity, the DDS members should have made this clear at the time Goodman brought it up, before the contract was signed. I also cannot agree with the majority that the progress payments made payable to the corporation do not show with reasonable certainty and probability that DDS intended to contract only with the corporation.

## Conclusion

The trial court found, in written findings, that DDS knew that the corporation which was a party to the renovation

contract was not yet in existence at the time the contract was signed; that the members of DDS, by their actions, impliedly agreed to look solely to the corporation for performance under the contract. The trial court further found that at no time did any member of DDS request of Goodman that he be personally liable on the contract; that all money received by the corporation went into the corporate bank account and were used to pay corporate obligations; neither Goodman nor the corporation profited from the contract, and there was no commingling of the personal assets and liabilities of Goodman and the corporation; and that Goodman exercised good faith in moving to have the corporation formed.

There was substantial evidence to support such findings and we must recognize their verity. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

I would affirm the order of the trial court staying arbitration proceedings as to John Goodman individually.

UTTER and DOLLIVER, JJ., concur with DORE, J.